IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KOHL FALLIN

       v.                      :   Civil Action No. DKC 19-1500

MAYOR AND CITY COUNCIL OF
BALTIMORE

## MEMORANDUM OPINION

Presently pending and ready for resolution in this employment case is the motion to dismiss filed by Defendant, the Mayor and City Council of Baltimore ("Defendant"). (ECF No. 4). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be denied in part and granted in part.

## I.  Background

### A.  Factual Background

Unless otherwise noted, the facts outlined here are set forth in the complaint and construed in the light most favorable to Plaintiff. Kohl Fallin ("Plaintiff") worked at the Baltimore City Department of Transportation ("BCDOT") as the Northwest Transportation Liaison Officer from November 2011 to January 2017.[1]

---

[1] Despite the spelling of Plaintiff's name in the complaint, the correct spelling is: Kohl Fallin. (ECF No. 9).

In August 2016, Plaintiff's personal workspace was vandalized. Plaintiff returned from lunch to find (1) a drawing of a penis and scrotum and the words "suck, suck, oh yeah" on Plaintiff's dry erase board; (2) the words "Suck Dis Dik Bitch!!!" on Plaintiff's work notebook; and (3) a drawing of a penis and scrotum and the words "Put it in your butt" on a note affixed to Plaintiff's computer monitor. (ECF No. 16, ¶ 12; *see also* ECF No. 22-1). Plaintiff "called the office assistant and [her] co-worker" to see the images and messages, photographed them, and e-mailed them to Jessica Roberson, with copies to Kathy Litz, an individual in the Human Resources department ("HR"), and Veronica McBeth, Chief of the Transit Division and Plaintiff's direct supervisor. (ECF No. 16, ¶¶ 13-14; ECF No. 22-1, at 1). Plaintiff informed HR and Ms. McBeth "that she felt unsafe, attacked on the basis of her sex, and was experiencing a high level of stress and anxiety[.]" (ECF No. 16, ¶ 15). HR and Ms. McBeth "never addressed the incident or engaged in any follow-up activities[.]" (*Id.*, ¶ 18). Plaintiff followed up with HR and Ms. McBeth about the incident and still did not receive a response. (*Id.*, ¶ 19).

In September 2016, the office assistant "verbally threatened" Plaintiff and "said she was going to have her daughter come to the office and 'beat the fuck out of' [Plaintiff]." (ECF No. 16, ¶ 21). Plaintiff does not identify

the office assistant, but she may be the same person that Plaintiff called to review the images and messages in August 2016. The office assistant admitted to the police that she made the threat. Plaintiff obtained a peace order against the office assistant and informed Ms. McBeth that she had a peace order. The office assistant did not face disciplinary action.

In September or October of 2016, Ms. McBeth moved Plaintiff's workplace to a building three blocks away, separating Plaintiff from her team. Plaintiff believed Ms. McBeth moved her workplace "because she had complained about the sexually explicit images and verbal violence at work." (ECF No. 16, ¶ 30). Around the same time, Ms. McBeth also "wrote [Plaintiff] up for insubordination." (*Id.*, ¶ 31). Plaintiff, working with the union, successfully challenged the insubordination allegation. Ms. McBeth also sent harassing e-mails to Plaintiff, requested that Plaintiff perform menial tasks, micromanaged Plaintiff, and required Plaintiff to keep daily timesheets. Plaintiff "complained to the union. . . and requested mediation." (*Id.*, ¶ 40). The union representative did not offer mediation and "only stated that they had followed up with management on the complaint." (*Id.*, ¶ 41).

During her employment at BCDOT, Plaintiff had only one performance review. She received "the highest mark for attendance" and "high marks for job productivity." (ECF No. 16,

¶ 52). Plaintiff "also received numerous instances of verbal positive performance feedback." (*Id.*, ¶ 53). Prior to August 2016, "Plaintiff had never been given a negative performance review and had not been written up." (*Id.*, ¶ 54).

BCDOT "has a progressive discipline policy." (ECF No. 16, ¶ 58). Under the progressive discipline policy, "an employee who is tardy should first be given verbal counseling." (*Id.*, ¶ 60). An employee who is tardy "should only be recommended for termination after *additional warnings* have already been provided." (*Id.*, ¶ 61) (emphasis in original).

On January 6, 2017, Plaintiff met with Ms. McBeth regarding a disciplinary action. Ms. McBeth informed Plaintiff that she had 13 unexcused tardies from December 2016 to January 2017 and imposed an immediate three-day suspension without pay. This was the first time Plaintiff learned of her alleged tardiness. Plaintiff explained that she was not tardy and that her work as a community liaison required her to be in the field (and therefore did not require her to arrive to work at the same time every day). During the meeting, Plaintiff realized she could not access her work calendar or e-mail "to prove that she was working in the field during the times in question." (ECF No. 16, ¶ 55). Ms. McBeth refused to provide Plaintiff access to offer such proof. On January 12, 2017, Plaintiff was terminated for alleged tardiness. (*Id.*, ¶ 66).

**B.   Procedural Background**

On July 7, 2017, Plaintiff filed her charge of discrimination with the Maryland Commission on Civil Rights ("MCCR") and the United States Equal Employment Opportunity Commission ("EEOC").[2] (ECF No. 16, ¶ 5; *see also* ECF No. 4-2). Plaintiff alleged that she was discriminated against based on sex and retaliation, explaining that she was subjected to sexual harassment, workplace violence, and retaliation. (ECF No. 4-2). On July 27, 2018, the EEOC dismissed the charge. (ECF No. 22-3).

On October 26, 2018, Plaintiff filed a complaint in the Circuit Court for Baltimore City, Maryland against the BCDOT and asserted two claims: (1) sex discrimination under the Maryland

---

[2] In reviewing a motion to dismiss, the court may "consider documents attached to the complaint, *see* Fed.R.Civ.P. 10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Defendant attached the charge of discrimination to its motion to dismiss. (ECF No. 4-2). Plaintiff's opposition to the motion to dismiss attached three exhibits: (1) the e-mail from Plaintiff to HR and Ms. McBeth attaching the pictures she took of the images and messages (ECF No. 22-1, which Plaintiff labels Exhibit A); (2) the notice of mailing of summons and complaint (ECF No. 22-2, which Plaintiff labels Exhibit B); and EEOC's dismissal of the charge (ECF No. 22-3, which Plaintiff labels Exhibit C). The complaint also references Exhibit A as an attachment, but the complaint is missing the attachment. (ECF No. 16, ¶ 12). The court may consider these documents without converting the motion into one for summary judgment. The court need not consider the City of Baltimore Workplace Violence Policy because although Plaintiff references it in the complaint, (ECF No. 16, ¶ 26), Plaintiff did not attach it and it is not integral.

Fair Employment Practices Act ("MFEPA") and (2) hostile work environment under MFEPA. (ECF No. 1-4). On February 27, 2019, the BCDOT filed a motion to dismiss and request for a hearing, arguing that "it is not a legal entity subject to suit." (ECF No. 1-5). On March 22, 2019, Plaintiff filed a first amended complaint. (ECF No. 1-2). The first amended complaint named Defendant, removed BCDOT, and asserted three claims: (1) sex discrimination under the MFEPA; (2) retaliation under the MFEPA; and (3) hostile work environment under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq*.[3] (ECF No. 16).

On May 21, 2019, Defendant filed a notice of removal and removed the case to the United States District Court for the District of Maryland. (ECF No. 1). On May 28, 2019, Defendant filed the presently pending motion to dismiss. (ECF No. 4). Plaintiff responded, (ECF No. 22), and Defendant replied, (ECF No. 25).

## II. Standard of Review

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the complaint. *Presley v. City of*

---

[3] The first amended complaint therefore identifies Count II as retaliation under MFEPA and Count III as hostile work environment under Title VII. The parties inexplicably refer to the MFEPA retaliation claim as "Count III" throughout their papers. Adding to the confusion, the first amended complaint was filed three times. (ECF Nos. 1-2; 2-8; 16). The court will refer to ECF No. 16.

*Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Legal conclusions couched as factual allegations are insufficient, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), as are conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## III. Analysis

Plaintiff brings her first two claims, for sex discrimination (Count I) and for retaliation (Count II), under MFEPA and brings her third claim, for hostile workplace (Count III), under Title VII. "The MFEPA is the state law analogue of Title VII." *McCleary-Evans v. Md. Dep't of Transp.*, No. 12-1550-ELH, 2015 WL 1285325, at *22 (D.Md. Mar. 30, 2015)

(quotation marks omitted), *aff'd*, No. 15-1409, 2016 WL 362287 (4th Cir. Jan. 29, 2016). "Maryland courts interpreting MFEPA have often found federal cases arising under Title VII to be persuasive authority." *Id.* Defendant argues that the statute of limitations bars Plaintiff's MFEPA claims. (ECF No. 4-1, at 1-2, 8-9; ECF No. 25, at 1-4). Therefore, the court will separately consider the MFEPA claims and the Title VII claims.

**A.  MFEPA**

**1.  Statute of Limitations and Relation Back**

The statute of limitations for Plaintiff's MFEPA claims is two years.[4]  Md. Code Ann., State Gov't § 20-1013 (a)(3). Defendant raises two arguments related to MFEPA's statute of limitations.  First, Defendant contends that Count I is time barred because the incidents supporting the claim occurred in August and September 2016 and Plaintiff filed her complaint in October 2018.  (ECF No. 4-1, at 1-2, 8-9).  Similarly, Defendant

_____

[4] The Maryland General Assembly recently amended the MFEPA statute of limitations to "alter[] the time period within which a complainant may bring a certain civil action alleging harassment[.]"  2019 Maryland Laws Ch. 222 (H.B. 679).  As amended, "a complainant may bring a civil action against the respondent alleging an unlawful employment practice, if. . . [(1)] the civil action is filed within [two] years after the alleged unlawful employment practice occurred; or (ii) if the complainant is alleging harassment, the civil action is filed within [three] years after the alleged harassment occurred." Md. Code Ann., State Gov't § 20-1013 (a)(3).  The amendment's effective date is October 1, 2019.  2019 Maryland Laws Ch. 222 (H.B. 679).  Plaintiff filed her complaint on October 26, 2018. Therefore, the amendment does not affect the state of limitations applicable to Plaintiff's MFEPA claims.

contends that Count II is time barred because "[v]irtually all of the alleged retaliatory behavior occurred more than two years before Plaintiff filed. . . in October 2018." (*Id.*, at 2, 9). Second, Defendant contends that both Counts I and II are time barred because although Plaintiff sued BCDOT in October 2018, Plaintiff did not sue Defendant until March 2019. (*Id.*, at 1-2, 8-9). The statute of limitations is an affirmative defense that must be raised by a defendant, who also bears the burden of establishing the defense. Fed.R.Civ.P. 8(c); *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).

Plaintiff concedes that the August 2016 incident (involving the graphic images and messages) and the September 2016 incident (involving the office assistant's verbal threat) "may indeed be untimely[.]" (ECF No. 22, at 7). However, Plaintiff emphasizes that she filed her complaint on October 26, 2018, and maintains that any claims relating to conduct occurring between October 26, 2016 and October 26, 2018 are timely. (*Id.*). Plaintiff also argues that her claims against Defendant "relate back" to her timely filing in October 2018. (*Id.*).

Fed.R.Civ.P. 15(c)(1)(C) states that "[a]n amendment to a pleading relates back to the date of the original pleading when:"

> the amendment changes the party or the naming of the party against whom a claim is asserted, if [the amendment asserts a claim

9

> or defense that arose out of the conduct,
> transaction, or occurrence set out. . . . in
> the original pleading] and if, within the
> period provided by [Fed.R.Civ.P. 4(m)] for
> serving the summons and complaint, the party
> to be brought in by amendment: (i) received
> such notice of the action that it will not
> be prejudiced in defending on the merits;
> and (ii) knew or should have known that the
> action would have been brought against it,
> but for a mistake concerning the proper
> party's identity.

Defendant challenges "Plaintiff's effort to cast blame" for mistakenly suing the BCDOT in the initial complaint and suggests that its relationship to Plaintiff was easily ascertainable. (ECF No. 25, at 6-7). However, Fed.R.Civ.P. 15(c)(1)(C)(ii) "asks what the prospective *defendant* knew or should have known during the [Fed.R.Civ.P. 4(m)] period, not what the *plaintiff* knew or should have known at the time of filing her original complaint." *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 548 (2010) (emphasis in original). Plaintiff's amended complaint against Defendant relates back to her initial complaint and Plaintiff may assert claims under MFEPA for conduct occurring between October 26, 2016 and October 26, 2018.

## 2. Discrimination (Count I)

As Plaintiff seemingly recognizes, her MFEPA claims relating to the August and September 2016 incidents are untimely. Plaintiff contends, however, that "her discrimination count is predicated on the 'generalized environment' of sex

based discrimination at the workplace, including but not limited to: micromanaging her work from October 2016 [to] January 2017, suddenly requiring [Plaintiff] to keep daily timesheets from September 2016 [to] January 2017; and unequal discipline during her termination on January 12, 2017." (ECF No. 22, at 7). She concludes: "Male employees were not subject to this scrutiny." (*Id.*).

Defendant characterizes this language as an effort by Plaintiff "to expand her lawsuit from sexual harassment and retaliation[] to include generalized sex discrimination claims," and argues the effort "must fail because [Plaintiff] failed to assert [sex discrimination] in her EEOC charge." (ECF No. 25, at 1, at 3-4). Relatedly, Defendant also argues that Plaintiff failed to exhaust her generalized discrimination claim.[5] (ECF No. 4-1, at 2, 9-10; ECF No. 25, at 4-6). Contrary to Defendant's argument, Plaintiff's charge of discrimination identifies both sex and retaliation as bases of discrimination. (ECF No. 4-2).

A plaintiff may establish a claim for sex discrimination using two methods. She may either demonstrate "through direct or circumstantial evidence" that her sex "motivated the

_____

[5] Defendant initially moved to dismiss for failure to exhaust under Fed.R.Civ.P. 12(b)(1), (ECF No. 4-1, at 6), but subsequently recognized that Fed.R.Civ.P. 12(b)(6) applies, (ECF No. 25, at 2).

employer's adverse employment decision," *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004), or she may "proceed under a 'pretext' framework" – outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and commonly referred to as the *McDonnell Douglas* approach – "under which the employee, after establishing a *prima facie* case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination," *id.* at 285.

Plaintiff alleges no direct or circumstantial evidence of discrimination. Thus, she must proceed under the pretext framework and allege that (1) she is a member of a protected class; (2) she was performing at a level that met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees outside the protected class more favorably. *Dones v. Donahoe*, 987 F.Supp.2d 659, 667 (D.Md. 2013). Plaintiff's conclusory allegations of disparate treatment are insufficient to state a claim. Count I will be dismissed as time barred for the August and September 2016 allegations and for failure to state a claim for allegations from October 26, 2018 to Plaintiff's termination.

### 3.  Retaliation (Count II)

Plaintiff also asserts a retaliation claim under MFEPA. Courts assess MFEPA retaliation claims under the same standards as Title VII retaliation claims.  *Hawkins v. Leggett*, 955 F.Supp.2d 474, 497 (D.Md. 2013).  Plaintiff must produce either direct evidence of retaliation or proceed under the *McDonnell Douglas* approach.  Plaintiff does not allege any direct evidence of retaliation.  Under the *McDonnell Douglas* approach, Plaintiff must allege three elements to establish a *prima facie* case of retaliation: (1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) the protected activity was causally connected to the adverse action.  *Sewell v. Strayer Univ.*, 956 F.Supp.2d 658, 671–72 (D.Md. 2013) (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007).  Defendant concedes that Plaintiff satisfies the second element and sufficiently alleges an adverse employment action (her termination).[6]  (ECF No. 4-1, at 19).  Thus, Defendant only challenges the first and third elements.  (*Id.*, at 17–20).

Defendant contends that Plaintiff did not engage in protected activity because she "only complained about a single, isolated instance of alleged harassment that was not severe and

---

[6] Given Defendant's concession, the court need not consider its contention that Plaintiff's other alleged instances of retaliation are not actionable.  (ECF No. 4-1, at 19).  Plaintiff responds that her "termination is her strongest basis for retaliation[.]"  (ECF No. 22, at 9 n.3).

13

pervasive." (ECF No. 4-1, at 18–19). "[A]n employee is protected from retaliation for opposing an isolated incident of harassment when she reasonably believes that a hostile work environment is in progress, with no requirement for additional evidence that a plan is in motion to create such an environment or that such an environment is likely to occur." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 284 (4th Cir. 2015). "The employee will have a reasonable belief that a hostile work environment is occurring if the isolated incident is physically threatening or humiliating." *Id.*

Here, Plaintiff e-mailed HR and Ms. McBeth, her supervisor, photographs of the images and words. (ECF No. 22-1). She also stated:

> I came back from lunch to find some very disturbing and sexually offensive messages posted on my desk, computer[,] and white board. . . I am hurt and deeply offended that such messages would be left in what is supposed to be a safe and [non-hostile] working environment. I am not only offended[], I am alarmed. I expect to work in a safe working environment free of sexual harassment. This is harassment of the worse kind. I expect a comprehensive investigation will take place immediately. I look forward to your response.

(*Id.*). Plaintiff's allegations support the conclusion that she reasonably believed a hostile work environment was in progress. She alleges an isolated incident that was humiliating.

Accordingly, Plaintiff sufficiently alleges that she engaged in protected activity.

Defendant also contends that Plaintiff fails to allege facts to create a causal link between her protected activity and the adverse employment action. (ECF No. 4-1, at 19-20). Defendant emphasizes the five months between Plaintiff's e-mail reporting the incident and her termination. (*Id.*). Defendant cites two cases, *Clarke v. Dyncorp Int'l LLC*, 962 F.Supp.2d 781 (D.Md. 2013) and *King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003), to argue that a lapse of two months precludes an inference of causation. (*Id.*). Defendant misreads these cases. *King* states: "[T]hat [the plaintiff's] termination came so close upon his filing of the complaint gives rise to a sufficient inference of causation to satisfy the *prima facie* requirement." 328 F.3d at 151. In a footnote (the portion Defendant cites), the United States Court of Appeals for the Fourth Circuit elaborated:

> [The plaintiff's] firing came two months and two weeks following [his supervisor's] receipt of notice that [the plaintiff] had filed an EEO complaint. . . This length of time between [the supervisor's] notice of the complaint and the adverse employment action is sufficiently long so as to weaken significantly the inference of causation between the two events. Yet, in the context of this particular employment situation, this length of time does not undercut the inference of causation enough to render [the plaintiff's] *prima facie* claim unsuccessful.

*Id.* at 151 n.5. Thus, *King* allows for an inference of causation when an adverse employment action follows protected activity but caveats that the length of time between two events weakens the inference. *Clarke* allows for the same. 962 F.Supp.2d at 790. Critically, both *King* and *Clarke* conclude the causal connection element was satisfied for the *prima facie* case.

The timing of Plaintiff's complaint and Plaintiff's termination allows for an inference of causation. Although almost five months elapsed between the two events, other allegedly adverse actions occurred in the interim that strengthen the inference of causation. Ms. McBeth relocated Plaintiff's workplace and separated Plaintiff from her team. (ECF No. 16, ¶¶ 27–28). Plaintiff's alleged tardies occurred after the relocation – in December 2016 and January 2017. (*Id.*, ¶ 46). Moreover, Plaintiff alleges that Ms. McBeth began treating her differently by sending harassing e-mails, requiring Plaintiff to hand deliver documents that she could previously e-mail, requiring Plaintiff to keep timesheets, and otherwise micromanaging Plaintiff. (*Id.*, ¶¶ 34–39). Finally, Plaintiff also reported Ms. McBeth to the union on two occasions. First, to challenge successfully Ms. McBeth's decision to write Plaintiff up for insubordination. (*Id.*, ¶¶ 31–33). Second, to complain about Ms. McBeth's treatment and to request mediation. (*Id.*, ¶ 40). Plaintiff alleges that Ms. McBeth was aware of

both these reports prior to Plaintiff's termination. (*Id.*, ¶¶ 33, 41–42). Plaintiff sufficiently alleges a causal link between her protected activity and the adverse employment action.

**B. Title VII**

Plaintiff asserts claims of discrimination based on unlawful harassment in violation of Title VII. Title VII prohibits discrimination based on an employee's characteristics such as "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013). Plaintiff alleges that she was subjected to a hostile work environment on the basis of her sex.

"To establish a *prima facie* case of hostile work environment, the plaintiff must prove: (1) that she was harassed because of her sex; (2) that the harassment was unwelcome; (3) that the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) that some basis exists for imputing liability to the employer." *Moret v. Green*, 494 F.Supp.2d 329, 341 (D.Md. 2007) (citing *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 241 (4th Cir. 2000).

Defendant contends that the August 2016 incident (involving the graphic images and messages) is not sufficiently severe or pervasive to satisfy the hostile work environment standard. (ECF No. 4-1, at 2–3, 13–15). Defendant also argues that there

is no basis for imputing liability to it. (*Id.*, 15–16). Finally, Defendant contends that the September 2016 incident (involving the office assistant's verbal threat) did not occur because of Plaintiff's sex. (*Id.*, at 11–13).

Plaintiff responds that "[t]he essence of [her] hostile work environment claim is the sexually explicit images on her desk[,]" seemingly conceding that the September 2016 incident did not occur because of her sex. (ECF No. 22, at 11). Plaintiff discusses *Pryor v. United Airlines, Inc.*, 791 F.3d 488 (4th Cir. 2015), to argue that she alleged sufficiently severe harassment. *Pryor* is distinguishable and Plaintiff fails to allege conduct that is sufficiently severe or pervasive to create an abusive working environment.[7]

Although Title VII "surely prohibits an employment atmosphere that is permeated with discriminatory intimidation, ridicule, and insult, it is equally clear that Title VII does not establish a general civility code for the American

---

[7] Plaintiff suggests that whether conduct is severe or pervasive is a jury issue. (ECF No. 22, at 12). However, as Defendant notes, (ECF No. 25, at 9), courts regularly consider and grant motions to dismiss hostile work environment claims. *See, e.g. Jackson v. Md. Dep't of Commerce*, No. 19-1693-JKB, 2020 WL 551914, at *8 (D.Md. Feb. 4, 2020); *Fisher v. J.O. Spice and Cure Co., Inc.*, No. 19-1793-CCB, 2020 WL 363347, at *4 (D.Md. Jan. 22, 2020); *Phillips v. Maryland*, No. 19-00653-PX, 2019 WL 6790394, at *3-4 (D.Md. Dec. 11, 2019); *Briscoe v. W.A. Chester, LLC*, No. 17-1675-GJH, 2018 WL 6065092, at *2-3 (D.Md. Nov. 11, 2018); *Bailey v. Int'l Paper*, No. 11-3013-PMD-BM, 2012 WL 405719, at *2-4 (D.S.C. Jan. 13, 2012).

workplace." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (citations and internal quotation marks omitted). Plaintiff must show not only that she subjectively believed that her workplace environment was hostile, but also that a reasonable person would have found it objectively hostile. *Id.* The objective inquiry requires courts to consider "all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto*, 786 F.3d at 277 (quotation marks omitted). "The behavior need not be *both* severe and pervasive: the more severe the conduct, the less pervasive the plaintiff need prove that it is." *Reed v. AirTran Airways*, 531 F.Supp.2d 660, 669 n.15 (D.Md. 2008). Nonetheless, "plaintiffs must clear a high bar . . . to satisfy the severe or pervasive test." *Sunbelt Rentals*, 521 F.3d at 315. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Here, Plaintiff alleges an isolated, single incident – the vandalization of her workplace. Plaintiff highlights the word choice "bitch" and characterizes the messages "suk dis dik

bitch!!!" and "put it in your butt" as sexually violent. (ECF No. 22, at 12-14). She attempts to analogize to *Pryor*, a case in which an African American employee "discovered in her company mailbox a paper note claiming to be a 'Nigger Tag - Federal Nigger Hunting License,' declaring that the holder was 'licensed to hunt & kill NIGGERS during the open search hereof in the U.S.'" 791 F.3d at 490. The note depicted "a person hanging from a pole or a tree. . . along with the words 'this is for you.'" *Id.* at 491. The note followed at least three other incidents of racism, two of which involved the same racial epithet. *Id.* at 492. Moreover, months later, the plaintiff received a second, "nearly identical racist death threat[.]" *Id.* at 494. Four other African American employees received the same racist death threat. *Id.* The Fourth Circuit concluded that the two racist death threats were sufficiently severe to alter the conditions of the plaintiff's employment and identified four considerations supporting that conclusion:

> First, the use of "the word 'nigger' is pure
> anathema to African-Americans," as it is to
> all of us. As the district court
> elaborated, the "use of that word is the
> kind of insult that can create an abusive
> working environment in an instant and is
> degrading and humiliating in the extreme."
> Second, as the district court also
> persuasively reasoned, the offensive
> language was made still more severe "by
> virtue of the presence of a clear element of
> violence" manifested by the threats inherent
> in a "hunting license" and the image of a

> lynching. . . Third, the location where [the plaintiff] discovered the threats added to their gravity. . . Fourth and finally, the context of the notes matters. In addition to the two threats that [the plaintiff] directly received, the record includes evidence of (1) the same threats left for several other flight attendants, (2) the racist message written on the two apartment advertisements, of which [the plaintiff] was aware; and (3) the racially-tinged prostitution rumors. While not severe enough on their own to subject [the plaintiff] to a racially hostile work environment, such facts contribute to our evaluation of the severity of the two threats [the plaintiff] received."

*Pryor*, 791 F.3d at 496-97 (internal alterations, citations, and quotation marks omitted).

*Pryor* is distinguishable on several grounds. First, *Pryor* involved multiple incidents occurring over several months. Here, Plaintiff alleges a single incident. Second, *Pryor* involved an explicit death threat. Here, while the parties dispute the nature of the note – Plaintiff characterizes it as "sexually violent," (ECF No. 22, at 12), and Defendant characterizes it as "telling Plaintiff that she should (voluntarily) engage in sexual activity with hand-drawn cartoons of a penis," (ECF No. 25, at 10) – they seem to agree it is not a death threat. Finally, Plaintiff cites no authority to support her assertion that the word "bitch" is "pure anathema to all females" in the same way that the racial epithet in *Pryor* is "pure anathema to African-Americans[.]" (ECF No. 22, at 13-14).

Indeed, courts considering identical or similar language leveled against female employees have concluded that the conduct is not sufficiently severe to support a hostile workplace claim. *See e.g. Whittaker v. David's Beautiful People, Inc.*, No. 14-2483-DKC, 2016 WL 429963, at *1, *4 (D.Md. Feb. 4, 2016) (concluding that calling the plaintiff, "among other things, a 'Russian whore,' a 'golddigger,' and a 'bitch[,]'" was "nothing more than a co-worker's rude, callous behavior[]"); *McLaurin v. Verizon Md., Inc.*, No. 14-4053-JKB, 2015 WL 5081622, at *4 (holding that the plaintiff did not allege an actionable hostile work environment claim despite allegations that one co-worker called the plaintiff a "bitch," another co-worker "urinated in front of her," and a supervisor "cursed" at her).

Moreover, "[i]n measuring the severity of harassing conduct, the status of the harasser may be a significant factor[.]" *Boyer-Liberto*, 786 F.3d at 278. "Simply put, 'a supervisor's power and authority invest[] his or her harassing conduct with a particular threatening character.'" *Id.* (alteration added) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998)). Plaintiff does not allege that her supervisor vandalized her workplace, and the circumstances suggest that she thought it was a co-worker.

Because Plaintiff fails to allege conduct that is sufficiently severe or pervasive, the court need not address

Defendant's argument that there is no basis for imputing liability to it. Count III will be dismissed.

## IV. Conclusion

For the foregoing reasons, the motion to dismiss filed by Defendant, the Mayor and City Council of Baltimore, (ECF No. 4), will be denied in part and granted in part. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
