IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KOHL FALLIN, | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No.: 1:19-cv-01500-JMC |
| MAYOR AND CITY COUNCIL OF BALTIMORE | * | |
| | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

This action arises from Plaintiff Kohl Fallin's allegations of sex discrimination against her former employer, the Baltimore City Department of Transportation ("BCDOT"). Plaintiff, who is African American, filed suit against the Mayor and City Council of Baltimore ("Defendant") alleging various acts of discrimination, retaliation, and hostile work environment during her course of employment with BCDOT from 2011 to 2017. Plaintiff's sole remaining claim of retaliation arises under the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code. (2014 Repl. Vol., 2017 Supp.), State Government Article ("SG") § 20-606.

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c) and Local Rule 301.4 (D. Md. 2021). (ECF Nos. 40; 41). Now pending before the Court is Defendant's Motion for Summary Judgment. (ECF No. 48). The Court has considered Defendant's motion, Plaintiff's Opposition thereto, and Defendants' Reply. (ECF Nos. 48, 50, 53). The issues have been fully briefed, and no hearing is necessary. *See* Loc. R. 105. For the reasons set forth more fully below, Defendant's Motion for Summary Judgment is GRANTED.

## BACKGROUND

Beginning in November 2011, BCDOT employed Plaintiff as a Liaison Officer I ("Community Liaison"). In this role, Plaintiff "act[ed] as a liaison between [BCDOT] and the community and promote[d] and coordinate[d] agency programs." (ECF Nos. 48-4 at 2; 50-3 at 1). More specifically, Plaintiff's work duties included acting as liaison between BCDOT and the community, attending community and neighborhood meetings to collect information for BCDOT and answering questions about BCDOT, advising community and neighbor groups on resolving problems and complaints regarding BCDOT, preparing reports on BCDOT policies, conducting special studies, and performing other related work as required. *Id.* Community Liaisons work "a conventional workweek that may involve evening hours." *Id.* And, given the nature of the work, "[w]ork is performed in an office and in the community. . . ." *Id.*

Veronica McBeth—BCDOT's Transit Bureau Chief—served as Plaintiff's direct supervisor. (ECF No. 50-5 at 4). Ms. McBeth supervised between twelve and fifteen employees, of which the majority were female. *Id.*

### August 2016 Incident and EEO Investigation

On August 18, 2016, Plaintiff discovered that her office workspace was vandalized while she was at lunch. (ECF Nos. 48-11 at 2; 50-8). The vandalism included sexually explicit drawings of male genitalia and messages placed on Plaintiff's desk, computer, and white board. *Id.* The messages—three in total—stated "suck suck oh yeah," "suck dis dik bitch," and "put it in your butt." (ECF No. 50-8). Upon Plaintiff's discovery, she called a co-worker, Sandra Matier, to witness the scene, photographed the area, and reported the incident Human Resources representatives, who also inspected Plaintiff's workspace. (ECF Nos. 48-11 at 2).

Unsatisfied with BCDOT's response to the August 2016 incident, Plaintiff filed an Equal Employment Opportunity ("EEO") complaint with BCDOT's Equal Opportunity Compliance Officer, Sandra Byrd, on August 29, 2016. (ECF No. 48-11 at 2). Ms. Byrd investigated the August 2016 incident and issued a final report on October 17, 2016. *Id.* at 2–4. Although the investigation failed to reveal who vandalized Plaintiff's office, the EEO report recommended that: (1) Plaintiff "be restored her personal leave used on the day of the incident and the next day";[1] (2) "[a]ll employees be given a key to their office doors"; and (3) Plaintiff be "offered an [Employment Assistance Program] as a result of the allegation of harassment." *Id.* at 4.

**August 2016 Discipline**

Ms. McBeth issued Plaintiff a "Written Reprimand for Falsifying Overtime Slip," on August 31, 2016 for violation of two Civil Service Commission Rules. (ECF No. 48-23 at 2). The reprimand also detailed what Ms. McBeth perceived to be insubordination. *Id.* In short, Plaintiff was scheduled to attend a public meeting concerning the Charm City Circulator on August 29, 2016 from 6:00 p.m. to 8:00 p.m. *Id.* Ms. McBeth observed Plaintiff arrive at 6:30 p.m., and leave at 7:45 p.m. *Id.* However, Plaintiff submitted an overtime slip for the full two hours. Thus, Ms. McBeth "made several attempts to explain . . . why the compensatory leave slip was inaccurate." *Id.* Plaintiff denied the inaccuracy, called Ms. McBeth "petty," rolled her eyes, and walked away from Ms. McBeth. *Id.* Plaintiff successfully grieved the discipline with assistance from her union. (ECF No. 48-24 at 2). After a second step grievance, Bureau Chief Richard Hooper found in favor of the union and requested "that the written warning be removed from [Plaintiff's] personnel file and that the discipline be reduced to a verbal warning (counseling)." *Id.* at 3.

---

[1] Human Resources later determined that Plaintiff should have been afforded "permission leave" instead of taking personal leave following the incident.

3

**September 2016 Incident**

On Friday, September 9, 2016, Plaintiff reported to a BCDOT Human Resources employee that a BCDOT office assistant—Helen Duplessis—verbally threatened Plaintiff when Ms. Duplessis told another employee that Ms. Duplessis would have her daughter "beat the fuck" out of Plaintiff. (ECF Nos. 48-12 at 2; 50-11 at 3). Plaintiff notified Ms. McBeth of the incident. (ECF No. 48-12 at 3). In response, Ms. McBeth emailed Plaintiff and informed her that "she would be temporarily relocating [Plaintiff] to another office" away from Ms. Duplessis. (ECF Nos. 48-12 at 3; 48-14 at 2). Plaintiff also notified the Baltimore City Police Department of the incident, causing officers to investigate on Monday, September 12, 2016. (ECF No. 48-12 at 2). Ms. Duplessis admitted to officers that she made the threatening statement. *Id.* Eleven days after the incident, on September 20, 2016, Plaintiff filed for a peace order against Ms. Duplessis in the District Court of Maryland for Baltimore City. (ECF No. 48-15). On September 22, 2016, Ms. Duplessis consented to the entry of a peace order. (ECF No. 48-16 at 2).

On September 30, 2016, Ms. McBeth discussed with Plaintiff options for a more permanent workspace in light of the incident with Ms. Duplessis. (ECF No. 48-18 at 3). Ms. McBeth offered Plaintiff an opportunity to select her new office location. (ECF No. 48-17 at 2). The next week, on October 4, 2016, Ms. McBeth followed up with Plaintiff via email:

> Please advise of your decision today with respect to the office locations that were provided to you (reminder: either moving back to the transit bureau and your old office – Ms. [Duplessis] would be shifted to another area during the duration of your peace order; or there is the option to move to 210 Guilford [Avenue] (safety [division]) to a work space over there. You would sign in with someone over there, but still continue to process all leave and comp slips through me). I will need an answer by 4 pm today so I can begin the necessary process to move you.

(ECF No. 48-18 at 3). Plaintiff responded that same day, inquiring of Ms. McBeth as to when Plaintiff would "be able to view the space in order to make an informed decision." *Id.* at 2. Ms.

McBeth emailed Plaintiff and various other BCDOT employees two days later to confirm Plaintiff's decision to move offices;[2] in pertinent part, Ms. McBeth stated, "[a]s per a conversation with [Plaintiff] this afternoon, she has decided to take the work space at 210 Guilford Avenue [(the "Guilford Office")] offered by Col. Cason. *Id.* Plaintiff's move to the Guilford Office was effective October 13, 2016. *Id.*

Jessica Roberson, a BCDOT Human Resources employee, investigated the September 2016 incident. (ECF No. 48-12). Ms. Roberson issued a report based on her investigation on October 5, 2016. *Id.* While Ms. Roberson concluded that the incident was not an act of workplace violence, she did conclude that Ms. Duplessis exhibited behavior unbecoming of a City employee—a violation of a Civil Service Commission Rules. Ultimately, the report recommended that Ms. Duplessis receive a written reprimand, attend counseling, and adhere to the peace order in effect through March 2, 2017. *Id.* at 2–4.

**Lateness and January 2017 Termination**

BCDOT issued a revised "DOT Lateness Policy" on October 1, 2014. (ECF Nos. 48-22 at 2; 50-7 at 2). The Lateness Policy defines "Lateness" as "the failure to report for work and be ready to work at the beginning of the assigned shift." *Id.* BCDOT monitors lateness "on a rolling one[-]year period of time." *Id.* The Lateness Policy further "specifically details the consequences of a lateness" as follows:

> 1st & 2nd Lateness – Supervisor notes the lateness in the supervisory file.
> 3rd Lateness – Supervisor reminds employee of the Lateness Policy and that this is the 3rd Note in file.
> 4th Lateness – Supervisor verbally counsels employee, issues another copy of Policy. Note in file.
> 5th – 8th Lateness – Each lateness requires a written discipline. Dock pay for amount of lateness.

---

[2] Plaintiff contends that she "had no say in this re-location," but that the opportunity to move office locations was "offered on a take it or leave it basis." (ECF No. 50-12 at 4).

> 9th Lateness – Written warning and offer [Employee Assistance Program].  Dock pay for amount of lateness.
> 10th Lateness – Dock pay for amount of lateness.  Issue suspension without pay memo for 1 day.
> 11th Lateness – Dock pay for amount of lateness.  Issue suspension without pay memo for 3 days.
> 12th Lateness – Dock pay for amount of lateness.  Issue suspension without pay memo for 5 days.
> 13th Lateness in a rolling one[-]year period – Recommendation for termination.  Dock pay for lateness[.]

*Id.*  The Lateness Policy further provided, "[i]f an employee notifies his/her supervisor prior to the shift of the anticipated lateness, [the] employee can request to utilize leave for period of lateness for 1st through 4th occasion.  Supervisory discretion must be utilized in these instances."  *Id.*

If a Community Liaison had a scheduled meeting outside of normal working hours, he or she would advise Ms. McBeth "via conversation or emails."  (ECF Nos. 48-5 at 3; 50-5 at 8).  If a Community Liaison intended to arrive to work late or leave work early, he or she was required "to put in a leave request" stating as much.  (ECF Nos. 48-6 at 3; 50-5 at 10).  While the BCDOT employees' start times varied, Plaintiff's start time was 8:30 a.m.  (ECF No. 48-7 at 2).

By email dated September 13, 2016, Ms. McBeth documented Plaintiff's first and second instances of lateness on September 9, 2016 and September 13, 2016.  (ECF No. 48-8 at 2).  Ms. McBeth sent Plaintiff a copy of the Lateness Policy and noted same in her supervisory file.  *Id.*  Ms. McBeth documented Plaintiff's third lateness—on October 5, 2016—the day it occurred.  (ECF No. 48-9 at 2).  Ms. McBeth again provided Plaintiff with a copy of the Lateness Policy and noted same in her supervisory file.  *Id.*  Plaintiff's fourth lateness occurred on November 21, 2016.  (ECF No. 48-7 at 2).  Consistent with the Lateness Policy, Ms. McBeth provided Plaintiff with another copy of the policy, and noted the lateness in Plaintiff's personnel file.  *Id.*  In each of these instances, Plaintiff emailed Ms. McBeth to alert her of the lateness.

On December 13, 2016, Ms. McBeth made "several attempts" to contact Plaintiff during Plaintiff's "designated work hours of 8:30 [a.m.] – 4:30 [p.m.] at [her] desk located at 210 Guilford Avenue." (ECF Nos. 48-19 at 2; 50-13 at 1). Ms. McBeth also tried, unsuccessfully, to reach Plaintiff on her work issued cell phone. *Id.* Ms. McBeth then emailed Plaintiff "a time-sensitive matter and did not get a response," despite previously warning Plaintiff "both verbally and via e-mail" about her "failure to respond to e-mails or calendar invites in a timely fashion." *Id.* Ms. McBeth then contacted other staff at the Guilford Office, and learned "that it was a common occurrence for [Plaintiff] to arrive after 8:30 [a.m.] and that" Plaintiff was not in her "office many other times during a normal work day." *Id.*

After learning this information, "Ms. McBeth began an investigation to review the accuracy of [Plaintiff's] submitted time sheets." (ECF Nos. 48-19 at 2; 50-13 at 1). Ms. McBeth "utilized available CCTV video" footage from the Guilford Office "lobby entrance to verify [Plaintiff's] entrance times," "compared the video footage to [Plaintiff's] time sheets," and "recognized there were multiple inconsistencies." *Id.* Ms. McBeth concluded that, from December 13, 2016 to January 3, 2017, Plaintiff's arrival times "ranged from twenty minutes to one hour beyond [Plaintiff's] designated start time on multiple occasions. *Id.* Specifically, Ms. McBeth noted thirteen instances where Plaintiff arrived to work laten, with an "average arrival time past schedule[d] start time" of more than thirty-two minutes. (ECF Nos. 48-19 at 3; 50-13 at 2). On multiple days, Plaintiff's corresponding time and attendance sheets reflected a timely arrival and departure time. (ECF No. 50-14).

On January 6, 2017, BCDOT provided Plaintiff "written notification of her immediate suspension without pay, detailed information regarding the discrepancies between her time sheets and security screening arrival time," and notice of a "pre-termination hearing scheduled for

7

January 11, 2017." (ECF No. 48-20 at 7). Plaintiff attended the pre-termination hearing with a union representative. (ECF Nos. 48-19 at 2; 50-13 at 1). Ms. McBeth and Director of Human Resources Kathy Litz were also present. *Id.*

BCDOT terminated Plaintiff on January 12, 2017. (ECF Nos. 48-19 at 2; 50-13 at 1). BCDOT found Plaintiff's actions to have violated several Civil Service Commission Rules. (ECF Nos. 48-19 at 4; 50-13 at 3). In addition to the factual bases for termination outlined, *supra*, BCDOT offered the following explanation in Plaintiff's termination letter:

> You submitted daily time sheets stating that you arrived at your designated start time during dates ranging from December 13, 2016 to January 3, 2017. It was discovered you were late on thirteen occasions during that time period. Had Ms. McBeth known of your lateness as you incurred them, she would have had an opportunity to issue progressive discipline with each instance. You chose to commit fraud in an attempt to keep your supervisor from learning of your lateness. With the thirteen occasions listed above, you have accumulated a total of seventeen latenesses [sic] in a rolling year and termination would have been recommended previously had you been forthcoming on your daily time sheets.
>
> During the pre-termination hearing[,] you had no explanation for any of the charges of fraud. You stated that you could not respond without copies of your emails for the month of December. You were given copies of your December calendar[,] but you still could not offer any explanation for the specific dates stated in the chart [documenting Plaintiff's lateness]. You only offered that your position requires being out in the field often.

(ECF Nos. 48-19 at 4; 50-13 at 3).

Plaintiff appealed her termination to the Civil Service Commission, which conducted a hearing on June 16, 2017, and issued a decision on June 26, 2017. (ECF No. 48-20 at 2). The Hearing Officer upheld Plaintiff's termination. *Id.* at 11.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party can do so by demonstrating the absence of any

8

genuine dispute of material fact or by showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A nonmoving party "opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). The court is "required to view the facts and draw reasonable inferences in the light most favorable to" the nonmoving party. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)). However, the Court must also "abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Heckman v. Ryder Truck Rental, Inc.*, 962 F. Supp. 2d 792, 799–800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). Consequently, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330–31 (4th Cir. 1998).

**DISCUSSION**

While Plaintiff's claim of retaliation arises under MFEPA, cases interpreting Title VII guide this Court's analysis. *See Arsham v. Mayor & City Council of Balt.*, 85 F. Supp. 3d 841, 849 (D. Md. 2015) (citation omitted) (concluding that because the MFEPA is the Maryland "state law analogue of Title VII," Plaintiff's claims arising under MFEPA are "guided by federal cases interpreting Title VII"); *Hawkins v. Leggett*, 955 F. Supp. 2d 474, 497 (D. Md. 2013). Under Title

VII, it is unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Additionally, "Title VII prohibits an employer from retaliating against a worker for either participating in a Title VII proceeding or opposing an employer's discriminatory practices." *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 255 (4th Cir. 1998) (citing 42 U.S.C. § 2000e-3(a)).

Generally, at trial, a plaintiff may establish discrimination under Title VII through two distinct means:

> The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) [("*McDonell Douglas*")].
>
> * * *
>
> As indicated, these avenues of proof pertain to trial. At this juncture, reference to these methodologies merely serves to inform a court's evaluation of a motion for summary judgment. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (recognizing that a Title VII plaintiff may avoid summary judgment by proceeding under the framework established in *McDonnell Douglas Corp.*); *Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas*").

*Angelini v. Baltimore Police Dep't.*, 464 F. Supp. 3d 756, 777–78 (D. Md. 2020) (internal citations omitted). As originally set out by the Supreme Court, *McDonnell Douglas* established a three-step burden-shifting approach where

> the plaintiff-employee must first prove a prima facie case of discrimination by a preponderance of the evidence. If she succeeds, the defendant-employer has an opportunity to present a legitimate, non-discriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the prima facie case drops out of the picture and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination.

10

*Wang v. Metro. Life Ins. Co.*, 334 F. Supp. 2d 853, 862 (D. Md. 2004) (citing *Mackey v. Shalala*, 360 F.3d 463, 468 (4th Cir.2004)). Despite the burden-shifting nature of this process, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Angelini*, 464 F. Supp. 3d at 778.

To establish a *prima facie* claim of retaliation under Title VII, a plaintiff must demonstrate: (1) that she engaged in protected activity; (2) that the employer took a materially adverse action against him; and (3) there is a causal connection between the protected activity and the adverse action. *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61–68, (2006) ("*Burlington*") (replacing "adverse employment action" in the second element with "materially adverse action").

Derived from the text of 42 U.S.C. § 2000e-3(a), "protected activity" can be categorized in one of two ways: "participation [or] opposition." *Id.* (citing *Laughlin*, 149 F.3d at 259). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take [an] adverse employment action against an employee for opposing discrimination practices in the workplace." *Id.* (citing *Laughlin*, 149 F.3d at 259).

The second element—materially adverse action—requires that a plaintiff "show that a *reasonable* employee would have found the challenged action *materially* adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Perkins*, 936 F.3d at 213 (emphasis added) (quoting *Burlington*, 548 U.S. at 68). As the Supreme Court elaborated in *Burlington*,

> We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth a general civility code for the American workplace.

11

\* \* \*

> We refer to reactions of a reasonable employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings.

*Burlington*, 548 U.S. at 68–70 (internal citations and quotation marks omitted).

Finally, to establish causal connection in a Title VII retaliation claim, a plaintiff must show that the employer took the materially adverse action "*because* the plaintiff engaged in a protected activity." *Perkins*, 936 F.3d at 214 (quoting *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original)). The Fourth Circuit has made clear that "establishing a 'causal relationship' at the *prima facie* stage is not an onerous burden." *Strothers v. City of Laurel*, 985 F.3d 317, 335 (4th Cir. 2018) (citations omitted). A *prima facie* showing of causation requires that a plaintiff establish "(1) the employer either understood or should have understood the employee to be engaged in protected activity[;] and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Id.* at 336 (citations omitted). However, at the pretext stage of the *McDonnell Douglas* burden-shifting framework, a plaintiff must establish but-for causation. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 251–52 (4th Cir. 2015) ("[T]he *McDonnell Douglas* framework has long demanded proof at the pretext stage that retaliation was a but-for cause of a challenged adverse employment action.").

Turning to the facts of this case, there is no dispute that BCDOT terminated Plaintiff on January 12, 2017, and that the termination constitutes a materially adverse action. (ECF Nos. 48-1 at 14; 50 at 12). Thus, the Court will focus its analysis on the first and third elements of a Title VII retaliation claim.

## I.     *Protected Activity.*

At the outset, the Court must address Defendant's argument that Plaintiff is "procedurally barred from raising the August and September 2016 incidents as evidence [Plaintiff] engaged in protected activity." (ECF No. 48-1 at 7). Defendant relies on SG § 20-1013, which provides in relevant part that "a complainant may bring a civil action against the respondent alleging an unlawful employment practice, if . . . the civil action is filed within 2 years after the alleged unlawful employment practice occurred." SG § 20-1013(a)(3). Defendant's reliance is misplaced. All SG § 20-1013(a)(3) requires is that a plaintiff file his or her civil action within two years of the alleged unlawful employment practice—here, termination. It does not demand, as Defendant suggests, that all facts necessary to support a MFEPA claim occur within the two-year period preceding the filing of the complaint. The fact that Plaintiff's alleged protected activity occurred more than two years prior to the filing of Plaintiff's complaint is immaterial. Instead, that Plaintiff filed her civil action within two years of BCDOT's alleged unlawful employment practice is sufficient for purposes of SG § 20-1013(a)(3).[3]

Accordingly, because Plaintiff's reporting of the August 2016 incident is not time barred, the Court may properly consider same as evidence that Plaintiff engaged in a protected activity. And, it is not difficult to conclude that Plaintiff's reporting the August 2016 incident is a "protected activity" under the participation prong of 42 U.S.C. § 2000e-3(a). Plaintiff, upon discovering hand-drawn images and messages fairly considered sexual in nature, contacted Human Resources representatives and filed an EEO complaint with BCDOT's Equal Opportunity Compliance Officer, Ms. Byrd, on August 29, 2016. (ECF No. 48-11 at 2). Ms. Byrd investigated and issued

---

[3] Additionally, Defendant misreads the portion of this Court's February 14, 2020 Memorandum Opinion noting in relevant part that "Plaintiff may assert claims under MFEPA for conduct occurring between October 26, 2016 and October 26, 2018." *Id.* at 10. There, the Court simply noted that Plaintiff may assert claims that BCDOT committed unlawful employment acts through conduct occurring during that time frame.

13

a report on October 17, 2016.  *Id.* at 2–4.  Plaintiff "participated . . . in an investigation" arising under Title VII and has, therefore, engaged in a protected activity.  *See* 42 U.S.C. § 2000e-3(a).

## II.     *Causal Connection.*

Given the above, Plaintiff must demonstrate a causal connection between her report, and participation in the investigation, of the August 2016 incident to her January 7, 2017 termination.  As to this element, Plaintiff's argument misses the mark in several regards.

First, Plaintiff relies chiefly on the temporal proximity between her reporting and termination to demonstrate that the later occurred *because of* the former.  (ECF No. 50 at 12).  In so arguing, Plaintiff relies on three cases within this Circuit for that proposition that temporal proximity between a protected activity and materially adverse employment action is sufficient to give rise to an inference of causal connection at the *prima facie* stage.  *Id.*; *see King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003) (citation omitted) ("[T]hat [the plaintiff's] termination came so close upon his filing of the complaint gives rise to a sufficient inference of causation to satisfy the *prima facie* requirement."); *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (concluding that less than two years between plaintiff's protected activity and employment "downgrade" were "sufficient to establish a *prima facie* case" of causal connection for retaliation claim); *Rhodes v. Comcast Cable Commc'ns. Mgmt.*, LLC, Civ. No. GLR-14-1824, 2016 WL 4376653, at *7 (D. Md. Aug 17, 2016) (citation omitted) ("[A] causal connection for purposes of demonstrating a *prima facie* case exists where the employer takes adverse employment action against an employee shortly after learning of the protected activity.").

The Court accepts this argument as far as it goes; temporal proximity generates a *prima facie* case that Plaintiff's termination was the result of her protected activity.  Less than five months elapsed between Plaintiff's protected activity and her termination.  However, at this juncture more

is required: but-for causation. *See Foster*, 787 F.3d at 251–52. Here, BCDOT provided a legitimate, non-discriminatory reason for Plaintiff's termination—Plaintiff's excessive tardiness in a one-year period and fraudulent concealment of same by submitting inaccurate time sheets. Thus, "the presumption of unlawful discrimination created by the *prima facie* case drops out of the picture and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination." *Wang*, 334 F. Supp. 2d at 862 (citing *Mackey*, 360 F.3d at 468).

However, shouldered with that burden, Plaintiff failed to show that BCDOT's legitimate, non-discriminatory explanation for terminating Plaintiff was pretextual. On this point, Plaintiff's argument is two-fold. Plaintiff dedicates a significant portion of its Response arguing that Plaintiff was *not* late thirteen times during the relevant period, and that Plaintiff was not the individual captured on CCTV footage arriving late to work and leaving early. (ECF No. 50 at 13–16). Despite conceding that Ms. McBeth conclusively identified Plaintiff based on her review of the CCTV footage, (ECF No. 50 at 18 n.48) (citing ECF No. 50-5 at 17), Plaintiff clings to the deposition testimony of Jeffery Fleming, Plaintiff's coworker, and Frank Murphy, then Acting-Director of BCDOT, in an effort to contradict Ms. McBeth's account.

As to Mr. Fleming, Plaintiff makes the bold assertion that he "could not identify the individual in the" still images captured from CCTV video footage, before quoting various portions of Mr. Fleming's testimony that *identifies Plaintiff* as the individual. (ECF No. 50 at 14). For example, Mr. Fleming states, "Oh that's Kohl, because of her dress and her small build, I would say that was Kohl," "[f]ace features could be Kohl," and "I would say that is Kohl by looking at the eyes and the nose." *Id.* at 14–15. Despite these assertions, Mr. Fleming is equivocal in his testimony—he states that he is "not 100% sure," and makes various comments to the effect that he would not bet on Plaintiff being the individual pictured. *Id.* at 15. Mr. Murphy's testimony is no

15

more helpful; he also is "not 100-percent sure" because his "eyes aren't that good." (ECF No. 50 at 15). Nevertheless, Plaintiff cannot generate a dispute of material fact relying on Mr. Fleming and Mr. Murphy's speculation and conjecture that the individual pictured is *not* Plaintiff. This is especially so where Mr. Fleming and Ms. McBeth affirmatively identify Plaintiff on multiple occasions. Put another way, where there exists credible evidence in the record, speculation to the contrary will not create a genuine dispute of material fact to preclude summary judgment. *See Anderson*, 477 U.S. at 247–48 ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."); *Scott*, 550 U.S. at 380 (citation omitted) ("[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .").

      Finally, Plaintiff suggests that an BCDOT's deviation from its own progressive discipline policy is evidence of pretext. (ECF No. 50 at 17–18). This argument is equally unavailing. Plaintiff has not cited, nor is this Court aware, of precedent within the Fourth Circuit that an employer's deviation from its own disciplinary policy is conclusive evidence of pretext. Plaintiff's citations to cases from other Circuits suggest only that this evidence "*may* give rise to *inferences* of pretext." *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 477 (5th Cir. 2015) (emphasis added and citation omitted); *see also Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003) ("[U]nexplained [hiring] inconsistency can justify an inference of discriminatory motive."). Here, BCDOT provided a credible explanation, supported by the record, for its departure from the Lateness Policy—Plaintiff concealed her lateness by failing to alert Ms. McBeth and submitting fraudulent time sheets. Thus, BCDOT, could not discipline Plaintiff pursuant to the stated policy.

16

Instead, upon discovering that Plaintiff had been absent more than thirteen times in a rolling one-year period, BCDOT terminated Plaintiff.

In sum, Plaintiff has failed to offer sufficient evidence to demonstrate that, because Plaintiff reported and participated in an investigation surrounding the August 2016 incident, BCDOT terminated Plaintiff. Plaintiff's arguments aside, "mere knowledge on the part of an employer that an employee" has engaged in protected activity "is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons" for materially adverse action. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989). As detailed above, BCDOT had legitimate, non-discriminatory reasons for terminating Plaintiff—repeated lateness and fraudulent concealment of same. Plaintiff offers no evidence that such justification was pretextual. Therefore, Plaintiff has not met her burden of demonstrating a viable retaliation claim. Defendant is entitled to summary judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 48) is GRANTED. Judgment is entered in Defendant's favor. The Clerk is directed to CLOSE this case. A separate order follows.


Date: August 23, 2021                                /s/
                                              J. Mark Coulson
                                              United States Magistrate Judge